Caitlin Boland Aarab
Samir F. Aarab
BOLAND AARAB PLLP
18 6th Street N, Suite 200
Great Falls, MT 59401
Telephone: (406) 315-3737
Fax: (406) 315-4267
cbaarab@bolandaarab.com
sfaarab@bolandaarab.com

Raph Graybill
Rachel Parker
GRAYBILL LAW FIRM, P.C.
300 4th Street North
PO Box 3586
Great Falls, MT  59403
Telephone: (406) 452-8566
Fax: (406) 727-3225
raph@graybilllawfirm.com
rachel@graybilllawfirm.com

*Attorneys for Plaintiffs and the
Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| STEVEN GROUT, DONNA WILLIAMS, REBECCA SCOTT, on behalf of themselves and other persons similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>WAKEFIELD & ASSOCIATES, LLC<br><br>    Defendant. | Cause No. CV-25-110-GF-JTJ<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Steven Grout, Donna Willians and Rebecca Scott, (collectively, "Plaintiffs"), bring this Class Action Complaint against Defendant Wakefield & Associates, LLC ("Defendant"), in their individual capacities and on behalf of all others similarly situated (the "Class" or "Class Members"), and allege upon

1

personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters as follows:

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs bring this class action lawsuit against Defendant Wakefield & Associates, LLC ("Wakefield") for its failure to adequately secure and safeguard the highly confidential personally identifiable information ("PII") and protected health information ("PHI") of Plaintiffs and Class Members—including names, dates of birth, Social Security numbers, medical and billing information, and provider identifiers ("Private Information")—resulting in a widespread, preventable data breach (the "Data Breach").

2.    Wakefield is a debt-collection and revenue-cycle management company that knowingly collects and stores sensitive personal and medical information from patients of healthcare providers across the United States.[1] As a business that regularly receives and maintains such data, Wakefield owed Plaintiffs and Class Members a duty to use reasonable and industry-standard safeguards to secure the Private Information in its possession.

3.    Wakefield routinely receives Plaintiffs' and Class Members' Private Information from healthcare providers in connection with collection, billing, and

---

[1] https://wakeassoc.com/privacy-policy

related administrative functions. By accepting this information for its commercial benefit, Wakefield assumed legal and equitable duties to protect it from unauthorized access, exfiltration, and misuse.

4.      In obtaining, storing, and using Plaintiffs' and Class Members' Private Information, Wakefield undertook obligations to implement reasonable data-security measures, actively monitor its systems for known threats, maintain safeguards capable of preventing unauthorized access, and provide timely and accurate notice of any security incident. Yet Wakefield's own public-facing privacy and security representations demonstrate how little care it actually devoted to these obligations. Wakefield's website "privacy policy" consists largely of generic placeholder text—material instructing a business owner to "talk about how you started and share your professional journey," "explain your core values," and "add a photo, gallery, or video for even more engagement"—rather than any meaningful disclosure of data-handling practices or security controls. Its so-called "security" statement is likewise cursory, offering only a vague assurance that it "takes precautions" and that "no website can guarantee security," before directing users with concerns to "contact us via phone." These superficial, boilerplate statements confirm that Wakefield did not maintain, and did not meaningfully

represent that it maintained, the robust, industry-standard safeguards necessary to protect the highly sensitive medical and personal information entrusted to it.[2]

5.      Public reporting confirms that Wakefield experienced a major cybersecurity incident in January 2025, involving unauthorized access to files stored on its network.[3] According to filings with state regulators, the intrusion occurred on or about January 14, 2025, and Wakefield did not complete its internal investigation until September 24, 2025.[4]

6.      Despite the extraordinary sensitivity of the compromised information and the heightened threat of identity theft associated with exposure of medical and financial data, Wakefield did not notify affected individuals—including the 26,624 affected Montana residents—until November and December 2025, approximately ten months after the initial breach.[5] This delay violated industry standards and materially increased the risk of harm to Plaintiffs and Class Members.

---

[2] *Id.*

[3] https://www.hipaajournal.com/wakefield-associates-data-breach/

[4] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a8794077-a469-427d-887a-ed71e47efb9c.html; https://www.mass.gov/doc/2025-1888-wakefield-associates-llc; https://dojmt.gov/wp-content/uploads/2025/11/Consumer-notification-letter-13.pdf; https://ago.vermont.gov/document/2025-11-07-wakefield-associates-data-breach-notice-consumers; https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage

[5] *Id.*

7.     Publicly available reports state that the Data Breach resulted from an external hacking event in which criminal threat actors accessed and, upon information and belief, exfiltrated files containing PHI and other sensitive data. One report attributes the incident to a known ransomware group that claimed responsibility in February, 2025 and asserted it had obtained a substantial volume of data, including patient and employee information.[6]

8.     The compromised Private Information included categories that are specifically sought on illicit markets, including Social Security numbers, medical billing and health information, and data associated with collection accounts. Such information is routinely exploited for identity theft, medical identity theft, synthetic identity creation, tax fraud, and other criminal schemes.

9.     Upon information and belief, the Private Information at issue was compromised because Wakefield failed to implement reasonable and adequate data-security measures, failed to timely detect the intrusion, and failed to adopt safeguards sufficient to protect against well-known cyber threats targeting the healthcare and debt-collection industries. Wakefield's failures include, on information and belief, inadequate monitoring, insufficient access controls, and a lack of timely response capabilities.

---

[6] https://www.hipaajournal.com/wakefield-associates-data-breach/

10.    Plaintiffs and Class Members bring this action because Wakefield failed to: (i) adequately secure the Private Information in its possession; (ii) timely warn victims of its inadequate security practices; and (iii) employ reasonable and effective procedures to safeguard Private Information against foreseeable cyber threats. Wakefield's conduct amounts to negligence and violates state and federal statutes.

11.    Wakefield disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain reasonable data-security measures within its own systems, despite receiving and storing highly sensitive medical and personal information from healthcare providers. Wakefield failed to timely detect or contain the January 2025 intrusion, failed to employ safeguards capable of preventing unauthorized access and exfiltration, and failed to follow applicable protocols for protecting PHI and PII. Wakefield then waited nearly ten months to notify victims, further increasing the risk of identity theft and preventing Plaintiffs and Class Members from taking timely steps to protect themselves. As a result of these systemic failures, the Private Information of Plaintiffs and Class Members was exposed and remains at ongoing risk of misuse.

12.     Plaintiffs and Class Members have a continuing, legally cognizable interest in ensuring that their Private Information is and remains safe, and they are entitled to injunctive and other equitable relief.

13.     As a direct and proximate result of Wakefield's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injuries including: (i) invasion of privacy; (ii) loss or diminution of the value of their Private Information; (iii) lost time and opportunity costs associated with mitigation; (iv) increased exposure to fraud, identity theft, and medical identity theft; (v) an uptick in phishing, spam, and fraudulent communications; and (vi) the ongoing and material risk of further misuse of their still-unsecured Private Information. Plaintiffs seek relief on behalf of themselves and all similarly situated individuals to remedy these harms and prevent future data compromise.

## II.    PARTIES

14.     Steven Grout is a resident and citizen of Great Falls, Cascade County, Montana. He received a Data Breach Notice from Wakefield on December 8, 2025.

15.     Donna Williams is a resident and citizen of Great Falls, Cascade County, Montana. She received a Data Breach Notice from Wakefield on December 8, 2025.

16.    Rebecca Scott is a resident and citizen of Great Falls, Cascade County, Montana. She received a Data Breach Notice from Wakefield on December 8, 2025.

17.    Defendant Wakefield & Associates, LLC is a Tennessee corporation with its principal place of business located at 320 North Cedar Bluff Road, Knoxville, TN, 37923.

### III.    JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) this action is a proposed class action in which the putative class contains at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) at least one class member is a citizen of a state different from Defendant.

19.    The exercise of personal jurisdiction over Wakefield comports with both due process and Montana's long-arm statute because Wakefield has purposefully directed activities into Montana and Plaintiffs' claims arise out of this contact with Montana, including Wakefield's transaction of business within Montana, entry into a contract for services to be rendered in Montana, and commission of acts resulting in the accrual of a tort action within Montana.

20.     Venue is proper in the Great Falls Division pursuant to Local Rule 1.2(c)(3) and 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in Cascade County, Montana.

## IV.    <u>FACTUAL ALLEGATIONS</u>

### A.    **Background**

21.     Wakefield is a national debt-collection and revenue-cycle management company that provides billing, collections, and related administrative services to healthcare providers across the United States.

22.     In the course of providing these services, Wakefield routinely receives, handles, and stores patients' personally identifiable information ("PII") and protected health information ("PHI"), including Social Security numbers, dates of birth, addresses, medical billing details, health information, provider identifiers, and other sensitive data.

23.     By generating, obtaining, collecting, using, and deriving a commercial benefit from Plaintiffs' and Class Members' Private Information, Wakefield assumed legal and equitable duties to safeguard such information and knew or should have known that it was responsible for protecting it against unauthorized access, disclosure, or misuse.

24.     Plaintiffs' and Class Members' Private Information was provided to Wakefield by their healthcare providers as part of Wakefield's billing and

collection activities. Plaintiffs and Class Members did not choose Wakefield and had no ability to withhold their information from Wakefield once their providers transmitted it.

25.    At the time of the Data Breach, Wakefield stored Plaintiffs' and Class Members' Private Information within its computer systems and network environment, where it maintained data received from numerous healthcare clients.

26.    Wakefield made representations to consumers—through its website and otherwise—that it would maintain appropriate safeguards to protect the privacy and security of any information it collected or received. Wakefield's public-facing privacy statements further reinforced that it would handle such information responsibly and in compliance with applicable laws and industry standards.

27.    Plaintiffs' and Class Members' Private Information was transmitted to Wakefield with the reasonable expectation that Wakefield would comply with its obligations to keep such information confidential and secure from unauthorized access.

28.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and reasonably expected that entities receiving their information from healthcare providers would do the same.

Plaintiffs and Class Members value the security of their Private Information and rely on vendors like Wakefield to safeguard it.

29.    Wakefield had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Wakefield has a legal duty to keep consumers' Private Information safe and confidential.

30.    Wakefield had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") through its role as a business associate of healthcare providers, industry standards, contractual obligations, and its own representations to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access or disclosure.

31.    Wakefield derived a substantial economic benefit from collecting, storing, and using Plaintiffs' and Class Members' Private Information. Without the ability to obtain and retain such Private Information, Wakefield could not perform the billing and collection services from which it profits.

32.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Wakefield assumed legal and equitable duties and knew or should have known that it was responsible for protecting

Plaintiffs' and Class Members' Private Information from unauthorized access, disclosure, and misuse.

**B.    The Data Breach**

33.    In January 2025, cybercriminals gained unauthorized access to files stored within Wakefield's network environment, where Wakefield maintained the Private Information of Plaintiffs and Class Members that it had received from their healthcare providers. Notices filed with state attorneys general indicate that the intrusion occurred on or about January 14, 2025, and affected data Wakefield stored for multiple provider-clients.

34.    Wakefield provided notice of this security incident to the Montana Attorney General on November 7, 2025. It identified 26,624 affected Montanans.[7] An individualized Notice was received by each Plaintiff in December, 2025, with the blank portions in the sample below indicating that the client in question is "Benefis," and the information involved was "healthcare provider ID number, date of birth, Social Security number, and health information":

---

[7] https://dojmt.gov/office-of-consumer-protection/reported-data-breaches/

November 7, 2025

**NOTICE OF SECURITY INCIDENT**

Dear

Wakefield & Associates, LLC (□Wakefield□) is a revenue cycle and collections consulting firm for clients. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident:

Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying you out of an abundance of caution.

**What We Are Doing.** We take this incident and the security of information in our care very seriously. Upon becoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed existing security policies and implemented additional measures to further protect against similar incidents moving forward. We reported this incident to law enforcement and regulators.

As an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft protection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can find information on how to enroll in these services in the enclosed with this letter. We encourage you to consider enrolling in these services as we are not able to do so on your behalf.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the information contained in the enclosed □Steps Individuals Can Take to Help Protect Personal Information□ You may enroll in the complimentary identity monitoring services we are offering.

-*- Demonstration Powered by OpenText Exstream 11/04/2025, Version 23.1.0 64-bit -*-

**For More Information.** We understand you may have questions that are not addressed in this letter. You may contact our dedicated toll-free assistance line at 1-833-833-7202, Monday through Friday from 8 a.m. through 8 p.m. Eastern Time, excluding holidays.

Sincerely,

*Wakefield & Associates*

35.     Wakefield stated in its breach notices that its "review and investigation was complete on or about September 24, 2025." Despite completing its investigation by that date, Wakefield did not notify the concerned regulatory agencies and affected individuals—including Montana residents—until November and December 2025, nearly ten months after the initial intrusion.

36.     Wakefield did not use reasonable security procedures and practices appropriate to the nature of the highly sensitive medical and personal information it maintained for Plaintiffs and Class Members. Wakefield failed to implement adequate safeguards to prevent unauthorized access and/or acquisition, and failed to detect, contain, and/or report the intrusion for an extended period.

37.     As publicly reported, cybercriminals accessed files containing Private Information belonging to Plaintiffs and Class Members during the intrusion. Plaintiffs' and Class Members' Private Information—including PII and PHI—was accessed, exposed, and placed at continuing risk of misuse as a result of the Data Breach.

**C.     Defendant Acquires and Stores the Private Information of Plaintiffs and Class Members.**

38.     Defendant Wakefield derives a substantial economic benefit from providing billing, collection, and revenue-cycle services to healthcare providers,

and as a part of performing those services, Wakefield receives and stores Plaintiffs' and Class Members' Private Information.

39.    By obtaining and storing the Private Information of Plaintiffs and Class Members, Wakefield assumed legal and equitable duties and knew or should have known it was responsible for protecting the Private Information from disclosure.

40.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

41.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use that information solely for authorized billing and collection purposes, and to refrain from disclosing it except as permitted by law and necessary to perform those services.

42.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, even though they had no choice in whether their data was provided to Wakefield—their healthcare providers transmitted it as part of Wakefield's billing and collection services. Upon information and belief, Defendant represented that it would maintain and protect such information, demonstrating its awareness of the sensitivity of the data it handled. Defendant's failure to safeguard this information is particularly egregious given longstanding industry warnings about the cybersecurity risks facing entities

that store medical and financial data and the heightened duty to protect such information.

**D.    Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of Private Information are Particularly Susceptible to Cyber Attacks.**

43.    Defendant Wakefield's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant, preceding the date of the Data Breach.

44.    The healthcare industry is a prime target for ransomware attacks—such as this—because these organizations store vast amounts of sensitive data, including medical records, financial information, and personal identification details. This data is incredibly valuable on the black market, where it can be sold for purposes such as identity theft and insurance fraud. The high demand for this data makes healthcare a lucrative target for cybercriminals.[8]

45.    Wakefield knew or should have known that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

---

[8] https://www.raventek.com/safeguarding-patient-data-why-healthcare-is-a-prime-target-for-cybercrime/#:~:text=help%20mitigate%20risks.-,High%20Value%20of%20Patient%20Data,identity%20theft%20and%20insurance%20fraud.

16

46.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[9]

47.     In light of recent high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

48.     As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it on behalf of Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

49.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

_____

[9] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (http://notified.idtheftcenter.org/s/), at 6.

50.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the unauthorized exposure of the data.

51.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

52.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly PHI—fraudulent use of that information and damage to victims may continue for years.

**E.    The Value of Personally Identifiable Information is Substantial.**

53.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security

---

[10] 17 C.F.R. § 248.201 (2013).

number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

54.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[12]

55.    For example, Private Information can be sold at a price ranging from $40 to $200.[13]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

56.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed

---

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, http://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, http://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[14] *In the Dark*, VPNOVERVIEW, 2019, http://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

with yours, your treatment, insurance and payment records, and credit report may

be affected."[15]

57.    "Medical records are a gold mine for criminals—they can access a

patient's name, DOB, Social Security and insurance numbers, and even financial

information all in one place."[16] A complete identity theft kit that includes health

insurance credentials may be worth up to $1,000 on the black market.[17]

58.    The greater efficiency of electronic health records brings the risk of

privacy breaches. These electronic health records contain a lot of sensitive

information (e.g., patient data, patient diagnosis, lab results, medications,

prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One

patient's complete record can be sold for hundreds of dollars on the dark web. As

such, Private Information is a valuable commodity for which a "cyber black

market" exists where criminals openly post stolen payment card numbers, Social

Security numbers, and other personal information on several underground internet

---

[15] *Medical I.D. Theft*, EFraudPrevention
http://efraudprevention.net/home/education/?a=
187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be
%20affected.

[16] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data,
New Ponemon Study Shows*, IDX (May 14, 2015) https://www.idx.us/knowledge-
center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat..

[17] *Managing cyber risks in an interconnected world: Key findings from The Global
State of Information Security Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30,
2014), https://www.pwc.com/gx/en/consulting-services/information-security-
survey/assets/the-global-state-of-information-security-survey-2015.pdf.

websites. Unsurprisingly, the health care industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

59.    Between 2005 and 2019, at least 249 million people were affected by health care data breaches.[18] Indeed, during 2019 alone, over 41 million health care records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[19] In short, these sorts of data breaches are increasingly common, especially among health care systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[20]

60.    According to account monitoring company LogDog, medical data sells for $50 and up on the dark web.[21]

61.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial

---

[18] http://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.

[19] http://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.

[20] http://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/.

[21] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), http://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

62.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for health care they did not receive to restore coverage.[23] Almost half of medical identity theft victims lose their health care coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[24]

63.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data

---

[22] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, http://khn.org/news/rise-of-indentity-theft/.

[23] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), http://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[24] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, http://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last visited May 22, 2025).

Breach—PHI, SSNs and names—is impossible to "close" and difficult, if not impossible, to change.

64.    This data commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[25]

65.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

66.    For example, with the Private Information compromised in the Data Breach, identity thieves can fraudulently obtain medical services, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[26]

---

[25] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[26] *See, e.g.*, Nikkita Walker, *What Can You Do With Your Social Security Number*, CREDIT.COM (Oct. 19, 2023), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

67.    The fraudulent activity resulting from the Data Breach may not come

to light for years. There may be a time lag between when harm occurs versus when

it is discovered, and also between when Private Information is stolen and when it is

used. According to the U.S. Government Accountability Office ("GAO"), which

conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data
> may be held for up to a year or more before being used to commit
> identity theft. Further, once stolen data have been sold or posted on
> the Web, fraudulent use of that information may continue for years.
> As a result, studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.[27]

## F.    Defendant Failed to Comply with FTC Guidelines

68.    The FTC has promulgated numerous guides for businesses which

highlight the importance of implementing reasonable data security practices.

According to the FTC, the need for data security should be factored into all

business decision making. Indeed, the FTC has concluded that a company's failure

to maintain reasonable and appropriate data security for consumers' sensitive

personal information is an "unfair practice" in violation of Section 5 of the FTCA,

15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d

Cir. 2015).

---

[27] *Report to Congressional Requesters*, GAO, at 29 (June 2007),
http://www.gao.gov/assets/gao-07-737.pdf.

69.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

70.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

71.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the

FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

73.    Defendant was at all times fully aware of its obligation to protect the Private Information of consumers under the FTCA yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

## G.    Defendant Failed to Comply with HIPAA Guidelines

74.    Defendant is a business associate under HIPAA (45 C.F.R. § 160.103) because it receives, creates, maintains, and transmits protected health information on behalf of healthcare providers. As a business associate, Defendant is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and

Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

75.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").  *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

76.    HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

77.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

78.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

79.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

80.    HIPAA's Security Rule requires Defendant to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic

protected health information the covered entity or business associate creates,

receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the

security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such

information that are not permitted; and

d.    Ensure compliance by its workforce.

81.    HIPAA also requires Defendant to "review and modify the security

measures implemented … as needed to continue provision of reasonable and

appropriate protection of electronic protected health information." 45 C.F.R. §

164.306(e). Additionally, Defendant is required under HIPAA to "[i]implement

technical policies and procedures for electronic information systems that maintain

electronic protected health information to allow access only to those persons or

software programs that have been granted access rights." 45 C.F.R. §

164.312(a)(1).

82.    HIPAA and HITECH also obligated Defendant to implement policies

and procedures to prevent, detect, contain, and correct security violations, and to

protect against uses or disclosures of electronic protected health information that

are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. §

164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

83.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also

requires Defendant to provide notice of the Data Breach to each affected individual

"without unreasonable delay and in no case later than 60 days following discovery

of the breach."

84.    Here, Defendant did not comply with the HIPAA Breach Notification

Rule because it discovered the Breach in early 2025 but did not notify victims until

November or December, 2025.

85.    HIPAA requires business associates to implement administrative

safeguards, including policies for workforce training and sanctions for violations of

security procedures. See 45 C.F.R. § 164.308(a)(1)–(5). As a business associate

that creates, receives, maintains, and transmits PHI on behalf of covered entities,

Defendant was required to adopt and enforce such policies.

86.    Under the HIPAA Security Rule, business associates are required to

identify, respond to, and mitigate, to the extent practicable, harmful effects

resulting from security incidents involving protected health information. See 45

C.F.R. § 164.308(a)(6)(ii). As a business associate that created, received, and

maintained PHI on behalf of covered entities, Defendant was obligated to

implement and execute an effective incident-response and mitigation process.

87.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

88.    Defendant was at all times fully aware of its HIPAA obligations to protect the Private Information of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**H.    Defendant Failed to Comply with Industry Standards.**

89.    Experts studying cybersecurity routinely identify health care institutions like Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

90.    Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

91.    Other best cybersecurity practices that are standard at large institutions that store Private Information include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

92.    Based upon the nature of the Data Breach, it is reasonable to infer that Defendant failed to meet the minimum standards of any of the following

frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**I.    Defendant Breached Its Duty to Safeguard Plaintiffs' and Class Members' Private Information.**

94.    In addition to its obligations under federal laws, Defendant owed duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

95.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain

and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.      Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.      Failing to adequately protect consumers' Private Information;

c.      Failing to properly monitor its own data security systems for existing intrusions;

d.      Failing to adhere to industry standards for cybersecurity as discussed above; and

e.      Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

96.     Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems, which contained Private Information.

97.     Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

### J.    Common Injuries and Damages

98.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) loss of the benefit of their bargain with their healthcare providers, whose services reasonably included the secure handling of their information by third-party vendors; (d) diminution of value of their Private Information; and (e) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

### K.    The Data Breach Increases Victims' Risk of Identity Theft.

99.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come.

100.    According to public reporting, the Private Information of Class Members has already been listed for sale on the dark web because that is the *modus*

*operandi* of hackers. In addition, Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

101.   The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

102.   Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

103.   For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone

calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

104.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[28]

105.    With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

106.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it

---

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), http://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**L.    Loss of Time to Mitigate Risk of Identity Theft and Fraud.**

107.   As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

108.   Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own

computer networks; and checking their financial accounts and healthcare billing statements for any indication of fraudulent activity, which may take years to detect.

109.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

110.    These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[30]

---

[29] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), http://www.gao.gov/new.items/d07737.pdf.

[30] *See* Federal Trade Commission, *Identity Theft.gov*, http://www.identitytheft.gov/Steps.

111.  A study by Identity Theft Resource Center shows the multitude of

harms caused by fraudulent use of personal and financial information:[31]



**M.    Diminution of Value of Private Information**

112.  PII and PHI are valuable property rights.[32] Their value is axiomatic,

considering the value of Big Data in corporate America and the consequences of

cyber thefts include heavy prison sentences. Even this obvious risk-to-reward

---

[31] Jason Steele, "Credit Card and ID Theft Statistics," Oct. 24, 2017,
http://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-
statistics-1276.php.

[32] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of
Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,
15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little
cost, has quantifiable value that is rapidly reaching a level comparable to the value
of traditional financial assets.") (citations omitted).

analysis illustrates beyond a doubt that Private Information has considerable market value.

113.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[33]

114.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34,35]

115.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[36]

116.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[37]

---

[33] http://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[34] http://datacoup.com/.

[35] http://digi.me/what-is-digime/.

[36] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, http://computermobilepanel. nielsen.com/ui/US/en/faqen.html.

[37] *What to Know About Medical Identity Theft*, FTC (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft

117.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

118.   At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

119.   Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network, amounting to thousands of individuals' detailed Personal Information, and thus, the significant number of individuals who would be harmed by the exposure of the data.

120.   The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**N.    The Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.**

121.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

122.    Such fraud may go undetected for years; consequently, Plaintiffs sand Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

123.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**O.    Plaintiffs' Experiences.**

124.    Plaintiffs are patients of healthcare provider(s) that contracted with Defendant, and Plaintiffs' Private Information was transmitted to Defendant in

connection with Defendant's billing and collection services. Plaintiffs did not choose Defendant and did not provide their information to Defendant voluntarily.

125.   At the time of the Data Breach, Defendant retained Plaintiffs' Private Information in its system.

126.   Plaintiffs reasonably believed their Private Information was compromised in the Data Breach and stolen by cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

127.   Plaintiffs take reasonable measures to protect their Private Information. They have never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

128.   Plaintiffs store any documents containing their Private Information in a safe and secure location and diligently choose unique usernames and passwords for their online accounts.

129.   As a result of the Data Breach, Plaintiffs have experienced a significant increase in anxiety, depression, and fear.

130.   As a result of the Data Breach, Plaintiffs have suffered a loss of time and have spent and continues to spend time monitoring their account and credit score and have sustained emotional distress. This is time that was lost and unproductive and took away from other activities and work duties.

131.   Plaintiffs also suffered actual injury in the form of damage to and diminution in the value of their Private Information—a form of intangible property that was entrusted to Defendant by their healthcare providers for Defendant's billing and collection services, and which was compromised in and as a result of the Data Breach

132.   Plaintiffs suffered lost time, interference, and inconvenience as a result of the Data Breach.

133.   Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information, especially their name, Social Security number, and PHI, being placed in the hands of criminals.

134.   Defendant obtained and continues to maintain Plaintiffs' Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiffs reasonably believe their Private Information was compromised and disclosed as a result of the Data Breach.

135.   As a result of the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiffs are at

present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.   <u>CLASS ALLEGATIONS</u>

136.   Plaintiffs bring this class action individually on behalf of themselves and all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Class:

> **All individuals residing in the State of Montana whose Private Information was compromised in the Data Breach ("Class").**

137.   Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendant has a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

138.   Plaintiffs reserve the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

139.   **Numerosity:** On information and belief, the putative Class is comprised of 26,624 Montanans, making joinder impracticable.[38] Disposition of this matter as a class action will provide substantial benefits and efficiencies to the Parties and the Court.

---

[38] https://dojmt.gov/office-of-consumer-protection/reported-data-breaches/

140.    **Commonality and Predominance:** Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect Plaintiff's and Class Members' PII violated the FTC Act and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiff's and Class Members' PII;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiff and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

i. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

j. Whether Defendant breached duties to protect Plaintiff's and Class Members' PII;

k. Whether Defendant's actions and inactions alleged herein were negligent;

n. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

141.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

142.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

143.    **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class and have no interests adverse to, or conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

144.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual

48

difficulties are likely to be encountered in the management of this class action. The

damages and other financial detriment suffered by Plaintiffs and all other Class

Members are relatively small compared to the burden and expense that would be

required to individually litigate their claims against Defendant, so it would be

impracticable for Class Members to individually seek redress from Defendant's

wrongful conduct. Even if Class Members could afford individual litigation, the

court system could not. Individualized litigation creates a potential for inconsistent

or contradictory judgments and increases the delay and expense to all parties and

the court system. By contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy

of scale, and comprehensive supervision by a single court.

145.    **Injunctive and Declaratory Relief:** Defendant has acted and/or

refused to act on grounds generally applicable to the Class such that final

injunctive relief and/or corresponding declaratory relief is appropriate as to the

Class as a whole.

146.    Likewise, particular issues are appropriate for certification under Rule

24(c)(4) because such claims present only particular, common issues, the

resolution of which would advance the disposition of this mater and the parties'

interests therein. Such issues include, but are not limited to: (a) whether Defendant

owed a legal duty to Plaintiffs and Class Members to exercise due care in

collecting, storing, and safeguarding their PII; (b) whether Defendant failed to adequately monitor and audit their data security systems; and (c) whether Defendant failed to take reasonable steps to safeguard the PII of Plaintiffs and Class Members.

147.   All members of the proposed Class are readily ascertainable. Defendant has access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a breach notice letter.

## VI.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of the Plaintiffs and the Class)

148.   Plaintiffs re-allege and incorporate by reference all preceding factual paragraphs as though fully set forth herein.

149.   Defendant received, collected, stored, and maintained the Private Information of Plaintiffs and Class Members in connection with its billing and collection services for healthcare providers, and did so inadequately when storing and safeguarding this information within its own systems and when transmitting it as part of its operations.

150.   Upon accepting and storing Plaintiffs' and Class Members' Private Information on its computer systems and networks, Defendant undertook and owed

a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining,

retaining, securing, safeguarding, deleting, and protecting their Private Information

from unauthorized access and disclosure.

151.   Defendant owed a duty of care to Plaintiffs and Class Members to

provide data security consistent with industry standards and other requirements

discussed herein, and to ensure that its computer systems and networks, and the

personnel responsible for them, adequately protected the Private Information.

152.   Defendant's duty included a responsibility to implement processes by

which it could detect a breach of its security systems in a reasonably expeditious

period of time and to give prompt notice to those affected in the case of a data

breach.

153.   Defendant had full knowledge of the sensitivity of the Private

Information in its possession and the types of harm that Plaintiffs and Class

Members could and would suffer if the Private Information was wrongfully

accessed or disclosed. Plaintiffs and Class Members were therefore the foreseeable

victims of any inadequate data security practices.

154.   Defendant's duty to implement and maintain reasonable data security

practices arose as a result of the special relationship that exists between Defendant

and consumers, which is recognized by laws and regulations, including, but not

limited to, HIPAA, the FTC Act, and common law.

155.    Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

156.    Defendant knew Plaintiffs and Class Members relied on it to protect their Private Information. Plaintiffs and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiffs and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

157.    Defendant was aware, or should have been aware, of the fact that cybercriminals routinely target entities in the healthcare industry through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

158.    Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing

notification to Plaintiffs and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

159.   Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

160.   Defendant had a duty to protect and safeguard the Private Information of Plaintiffs and the Class from unauthorized access and disclosure. Additionally, Defendant owed Plaintiffs and the Class a duty:

a.      to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b.      to protect Plaintiffs' and Class Members' Private Information by using reasonable and adequate data security practices and procedures;

c.      to implement processes to quickly detect a data breach, security incident, or intrusion involving its networks and servers; and

d.      to promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

161.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information.

162.    The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a.      Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information;

b.      Failing to adequately monitor the security of its networks and systems;

c.      Failing to implement and maintain adequate mitigation policies and procedures;

d.      Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

e.      Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

f.    Failing to timely notify Plaintiffs and Class Members about the Data

Breach so they could take appropriate steps to mitigate the potential for

identity theft and other damages.

163.  Defendant's willful failure to abide by its duties to Plaintiffs and Class

Members was wrongful, reckless, and grossly negligent considering the

foreseeable risks and known threats.

164.  It was foreseeable that Defendant's failure to use reasonable measures

to protect Plaintiffs' and Class Members' Private Information would result in

injury to Plaintiffs and Class Members.

165.  Furthermore, the breach of security was reasonably foreseeable given

the known high frequency of cyberattacks and data breaches in the healthcare

industry.

166.  As a direct and proximate result of Defendant's negligent conduct,

including, but not limited to, its failure to implement and maintain reasonable data

security practices and procedures as described above, Plaintiffs and the Class have

suffered damages and are at imminent risk of additional harms and damages.

167.  Through Defendant's acts and omissions described herein, including

but not limited to Defendant's failure to protect the Private Information of

Plaintiffs and Class Members from being stolen and misused, Defendant

unlawfully breached its duty to use reasonable care to adequately protect and

secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

168.   Further, through its failure to provide timely notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach.

169.   Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breach.

170.   Plaintiffs and Class Members could have enrolled in credit monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

171.   Plaintiffs and Class Members suffered harm from Defendant's delay in notifying them of the Data Breach.

172.   As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud,

and/or unauthorized use of their Private Information, including the need for

substantial credit monitoring and identity protection services for an extended

period of time; (iv) lost time and opportunity costs associated with efforts

expended to address and mitigate the actual and future consequences of the Data

Breach, including, but not limited to, efforts spent researching how to prevent,

detect, contest and recover from fraud and identity theft; (v) costs associated with

placing freezes on credit reports and password protections; (vi) anxiety, emotional

distress, loss of privacy, and other economic and non-economic losses; (vii) the

continued risk to their Private Information, which remains in Defendant's

possession and is subject to further unauthorized disclosures so long as Defendant

fails to undertake appropriate and adequate measures to protect the Private

Information in its continued possession; and (viii) future costs in terms of time,

effort, and money that will be expended to prevent, detect, contest, and repair the

inevitable and continuing consequences of compromised Private Information for

the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an

amount to be proven at trial.

173.   The damages Plaintiffs and the Class have suffered and will suffer (as

alleged above) were and are the direct and proximate result of Defendant's

negligent conduct.

174.   Plaintiffs and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE *PER SE*
**(On Behalf of the Plaintiffs and the Class)**

175.   Plaintiffs re-allege and incorporate by reference all preceding factual paragraphs as though fully set forth herein.

176.   Defendant had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

177.   The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

178.    Defendant solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information as part of its regular business, which affects commerce.

179.    Defendant violated the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

180.    Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to implement and maintain fair, reasonable, and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

181.    Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

182.    Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

183.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, like Defendants, that fail to employ reasonable data security measures and avoid unfair and deceptive practices, causing the same harm as that suffered by Plaintiffs and the Class.

184.    Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

185.    Defendant's violations of the FTC Act constitute negligence *per se*.

186.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

187.    The injury and harm that Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

188.    Defendant also had a duty to use reasonable security measures under HIPAA, which requires covered entities and business associates, like Defendant, to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this action constitutes "protected health information" within the meaning of HIPAA.

189.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information. HHS

subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.304, 45 C.F.R. § 164.306(a)(1-4), 45 C.F.R. § 164.312(a)(1), 45 C.F.R. § 164.308(a)(1)(i), 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

190.   Defendant's violations of HIPAA constitute negligence *per se*.

191.   Plaintiffs and the Class are within the class of persons HIPAA was intended to protect.

192.   The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

193.   Defendant's duty to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect and secure Private Information in its possession and control.

194.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual instances of identity theft or fraud; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost time and opportunity costs associated with efforts to mitigate the actual and future consequences of the Data

Breach, including, but not limited to, time and resources spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) costs associated with placing or removing freezes on credit reports; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the ongoing impact of the Data Breach for the remainder of the lives of Plaintiff and the Class.

195.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer imminent and impending injuries arising from the increased risk of future fraud and identity theft.

196.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

197.    Plaintiffs and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

## COUNT III
## VIOLATIONS OF THE MONTANA CONSUMER PROTECTION ACT
### (On Behalf of the Plaintiffs and the Class)

198.   Plaintiffs re-allege and incorporate by reference all preceding factual paragraphs as though fully set forth herein.

199.   Defendant is a person within the meaning of the Montana Consumer Protection Act and it conducts "trade" and "commerce" within the meaning of the Act.

200.   Plaintiffs and the Class Members are "persons"  and "consumers" within the meaning of the Act.

201.   Defendant engaged in unfair or deceptive acts or practices in the conduct of its business by the conduct set forth above. These unfair or deceptive acts or practices include the following:

   a.   failing to adequately secure Plaintiffs' and the Class Members' sensitive Personal Information from disclosure to unauthorized third parties or for improper purposes;

   b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and the Class Members in a manner highly offensive to a reasonable person;

   c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and the Class Members without their informed, voluntary, affirmative, and clear consent;

    d.   omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plaintiffs' and the Class members' sensitive Personal Information; and

    e.   Failing to disclose the Data Breach in a timely and accurate manner.

202.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and the Class Members have suffered injury in fact and lost money.

203.   As a result of Defendant's conduct, Plaintiffs and the Class Members have suffered actual damages, including damages from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased and imminent risk of fraud and identity theft, the lost value of their personal information, and other economic and non-economic harm.

204.   Plaintiffs and the Class Members are therefore entitled to legal relief against Defendant including recovery of actual damages, treble damages, injunctive relief, attorneys' fees and costs, and such further relief as the Court may deem proper.

### COUNT IV
### DECLARATORY RELIEF
### (On Behalf of the Plaintiffs and the Class)

205.   Plaintiffs re-allege and incorporate by reference all preceding factual paragraphs as though fully set forth herein.

206.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

207.    An actual controversy has arisen in the wake of the Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard Personal Information in its custody and control and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Personal Information. Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their Personal Information and remain at imminent risk that further compromises of their Personal Information will occur in the future given the publicity around the Data Breach and the nature and quantity of the Personal Information stored by Defendant.

208.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things: (i) Defendant continues to owe a legal duty to secure Personal Information in its custody or control and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and (ii) Defendant continues

to breach this legal duty by failing to employ reasonable measures to secure Personal Information in its custody or control.

209. The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Personal Information in its custody or control.

210. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another data breach with Defendant occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

211. The hardship to Plaintiffs and Class Members, if an injunction does not issue, exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs with Defendant, Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

212.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach with Defendant, thus eliminating the additional injuries that would result to Plaintiffs and Class Members and the thousands of patients whose confidential information would be further compromised.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.     prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests,

and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information,

as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their

confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.  requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.  for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.  For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E.  For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F.  Pre- and post-judgment interest on any amounts awarded; and

G.  Such other and further relief as this court may deem just and proper.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs

demand a trial by jury on all issues so triable in this action.

Dated: December 10, 2025                 Respectfully Submitted:

*/s/ Caitlin Boland Aarab*
Caitlin Boland Aarab
**BOLAND AARAB PLLP**
18 Sixth Street North, Suite 200
Great Falls, MT 59401
(406) 315-3737
cbaarab@bolandaarab.com

*/s/ Raph Graybill*
Raph Graybill
**GRAYBILL LAW FIRM, P.C.**
300 4th Street North
Great Falls, MT 59403
(406) 452-8566
raph@graybilllawfirm.com

*Counsel for Plaintiffs and the Putative
Class*